WeldoN, J.,
delivered the opinion of the court:
The claimant filed a petition, No. 3892, to share in the bounty money as incident to the destruction of the -Spanish fleet in Manila Bay on May 1, 1898, and the court is asked to instruct the Auditor as to the right of the claimant to participate in that bounty,
In the case of Admiral Dewey v. The United States (35 C. Cls. R., 172) it was found by the court that on May 1,1898, an engagement took place between the following vessels of the United States Navy, to wit, the Olympia, the Baltimore, the Boston, the Raleigh, the Concord, the Petrel, the McCullough, the Nanshan, and the Zafiro, and the following vessels belonging to the King of Spain, to wit, Reina Cristina, the Castilla, the Don Juan de Ulloa, the General Lezo, the Marques del Duero, Argos, Yelasco, the Isla de Mindanao, the Don Juan de Austria, Isla de Cuba, the Isla de Luzon, and two torpedo boats.
In that proceeding no contest was made as to the ships which participated on the part of the United States in that engagement; but it is now insisted by counsel appearing for other vessels that the Nanshan, notwithstanding the finding of the court in that case, has no right to participate, and that the crew thereof is not to be taken into account in the distribution of the money arising from that destruction. The question in the case of Admiral Dewey was not as to whether certain ships participated, but whether the Admiral, as the commander of the American fleet, was entitled as the basis of his compensation to the sum of $100 or $200 as represented bjr the men on board of the Spanish ships; and the parties now in interest in this proceeding were not called upon and did not litigate as *397 to wbat American seamen or soldiers were entitled to share in the bounty as the crews of the different ships.
This being a proceeding to distribute the fund among the persons entitled to the same, excluding the commander of the fleet, if is competent and proper for the court now to consider upon the evidence in the case the rights of the claimant as against the officers and men of other ships participating in the Manila engagement. The findings. of fact in that case are not conclusive upon the rights of the parties in the case. It may be that upon further consideration the finding may be changed, that finding having only the force of an interlocutory order, and the subject-matter of this dispute still being-before the court. It was held in the case of Sampson v. The United States (ante, 194) that the order made in said case was subject to change until a full disposition of the matter.
The facts found by the court show that the claimant was captain or master of the original crew of the Nanshan, which was a British merchant vessel, purchased by Admiral Dewey at Hongkong, under authority of the Secretary of the Navy, in April, 1898. The vessel was not commissioned, but was registered as an American steamer, and the original crew was shipped in the American merchant service. The crew were employed to handle the ship, and the officers and men were promised and received double the wages they had theretofore been paid in the British merchant service. They were not rated in the United States Navy* and the double wages were not the rates of pay fixed by the President under authority of Revised Statutes, section 1564. The arrangement as to the employment and payment of the crew was the result of an agreement made by Admiral Dewey with the original officers of the Nanshan. A monthly list of the names and wages of the crew, in Mexican money, was made by the original captain or master, the aggregate amount of which was received by him from the pay inspector of the fleet in a lump sum, reduced to the value of American gold, which money the captain distributed to his original crew.
Admiral Dewey placed on board a naval officer, Lieut. Benj. W. Hodges, and four enlisted men, and two mounted 1-pounder guns. The master of the Nanshan, Capt. Edwin F. Stovall, remained on board, and under him were shipped the seamen, *398 as aforesaid. The naval officer exercised control over the vessel and gave all orders concerning her. The merchant captain was merely his executive officer, being familiar with the crew. The Nanshan did not approach the Spanish fleet during the battle of Manila near enough to enable her to be of any service. The guns were mounted on her as a protection from boat attacks, but not for offensive operations. At the time and during the battle of Manila, Lieut. Benj. W. Hodges had been detailed as aforesaid with four men of the Navy for duty on said vessel, and was so engaged on said vessel as above stated at and during the time of the battle. The Nanshan was loaded with 3,000 tons of coal. The Raleigh was detailed as a special guard in case the reserve division was attacked separately b3r the enemy. The duty of the naval captain on said ship was to take general charge of the vessel, execute all orders from the flagship controlling the movements of the Nanshan, the handling of the guns, and the signaling,' but not to interfere with the internal management and discipline of the ship and such things as loading and discharging cargo.
After the.vessel was bought by Admiral Dewey, the Nanshan crossed the China Sea with the fleet and was a part thereof. She kept her position in the fleet. After the fleet stopped at Subig Bay the Admiral ordered her commander to come on board the flagship for his final orders, afterwards returning to the Nanshan. The fleet started in single column, the Olympia leading, followed bjr the Baltimore, the Raleigh, the Petrel, the Concord, the Boston, the McCullough, the Nanshan, and Zafiro, passing the forts in that order. The forts on the south side of the channel fired upon the fleet as they were entering Manila Bay, and the Nanshan passed through that fire. The Nanshan was in reserve during the action, within signaling distance. She had on board two 1-pounders, taken from the Olympia, with 360 rounds of ammunition for those guns; also 11 rifles from the Raleigh and 11 revolvers, with a suitable amount of ammunition, and two boats rigged ready to lower to pick up men if it was found necessary to do so. The Nanshan was a heavy ship, being loaded to the underwriters’ mark with coal.
At the time and during the battle of Manila the Nanshan *399 was between 4 and 5 miles of the Spanish fleet engaged in that action. She was within signaling distance of the fleet that effected the destruction of the Spanish vessels, but was not in such condition as to afford effective aid, her guns not being-able to produce any effect upon the Spanish vessels; she was ordered to lay off in the bajr, clear of the fleet; she could not have been brought within effective range, because her guns were too light.
The determination of the question at issue in this proceeding is to settle by construction of the statute which regulates the distribution of prize money, the right of the claimant. Section 4632 defines-the vessels which are to share in the distribution of prizes, and the same law which determines that distribution determines the distribution in this case. The section provides as follows: “All vessels of the Navy within signal distance of the vessel or vessels making the capture under such circumstances and in such condition as to be able to render effective aid, if required, shall share in the prize.” Section 4614 defines what is understood by the law as “vessels of the Navy.” “The term ‘vessels of the Navy,’ as used in this title, shall include all armed vessels officered and manned by the United States and under the control of the Department of the Navy.”
Did the Nanshan, at the time of the battle of 'Manila, have impressed upon her the conditions and characteristics required and recognized by the statute ? In order to participate in the result of that victory she must have been in such a condition. as to enable her to render effective aid if it was required. The findings of fact show that she was not in such condition. Her condition indicates that she was not intended or expected to participate with the belligerent force employed in the battle, but, upon the contrary, that she was placed in reserve so as to be safe in case of certain conditions which might arise as an incident of the engagement. She was performing the functions of a collier, and, as a matter of fact, at the time of the battle needed protection rather than having the qrialifications of aggressive warfare.
Does she come within the definition of section 4614, in being an “armed vessel, officered and manned. by the United States ?” The crew she had on board was not of the United States Navy, *400 never having been enlisted, but simply employed by proper authority to perform manual labor incident to the necessities of the fleet, which sailed from Hongkong, and which finally destroyed a part of the Spanish navy. Can she be included in the term '‘armed vessels” simply because she had on board two 1-pounders and some small ai-ms ? Courts must look at substantial and not technical conditions in determining the rights of parties. It can not be inferred from her armament that she was equipped for any purpose of aggression, and that whatever protection she had from her armed condition was for the purpose of defense rather than attack.
Her condition, instead of having the power and qualifications of aggression, had the marked characteristics of helplessness.
Although she was within signal distance of the vessels making the capture, she was not in such a condition as to be able to render effective aid, and she was not kept in the relation which she sustained to the engagement for strategic purposes, but for the purpose of protection to herself and the incident protection of the rest of the fleet as the source of their coal supply.
The claim of .the captain and crew of the Nanshan to share in the bounty is further embarrassed by the difficulty arising under the fifth clause of section 4631, in which it is provided, “After the foregoing deductions the residue shall be distributed and proportioned among all others' doing duty on board, including the fleet captain, and borne on the books of the ship, in proportion to their respective rates of pay in the service.”
In this case the crew of the Nanshan, outside the detailed men of the Navy, were borne on the books of the ship as merchantmen. Their rates of pay were the result of a contract made by the Admiral of the Navy, at the time they were employed at Hongkong, as laborers and not as soldiers or enlisted men.
They were paid from a lump sum given to the claimant by the proper officer of the Navy in pursuance of the terms of the contract then subsisting between them and the United States. The distribution contemplated by the statute is to be made “according to their respective pay in the service.” *401 Section 1569 provides, “the pay to be allowed petty officers, excepting mates, and the pay and bountj^ upon enlistment of seamen, ordinary seamen, firemen, and coal heavers in the naval service, shall be fixed by the President: Provided, That the whole sum to be given for the whole pay aforesaid, and for the pay of officers, and for the said bounties upon enlistments shall not exceed, for any one year, the amount which may, in such year, be appropriated for such purposes.”
By the provisions of this statute it is the duty of the President to fix the pay of seamen, firemen, and coal heavers in the naval service, and such pay is to be regulated in each year by the amount Avhich may in such year be appropriated for such purposes. In this case no rate of pay had been established by the President, and the basis upon which the men engaged in the alleged military service during the naval engagement is wanting, but it is sought to base the ratio of such compensation upon the pay which is the result of a contract, and not upon the pay provided by Executive orders. Being bjr law without rates of pay in the service, can the rate of pay established by contract perform the function of the rate of pay established by Executive order?
It has been decided in this court in the Manila Bay case and also in the Santiago case that “additional pay” is the full compensation for detention, and does not increase pajr allowances. Bespective rates of pay refer to the regular rates of pay, thus giving construction to sections 1572 and 1422, on the theory that the rate of pay forming the basis upon Avhich the distribution is to be made is the regular pay in the Navy.
On the argument and in the brief of counsel the court’s attention is called to the case of the Ceylon, Mulac (1 Dod., 105), in Avhich it is held in substance that the employment of a vessel in the public military service of the enemy, by those who have competent authority so to employ her, “is a sufficient setting forth for war ” under the prize act, though the vessel may not be furnished Avith any formal commission of war. The facts upon which that decision is predicated are briefly as folloAvs:
An East India ship had been captured by French frigates and carried to the Isle of Johanna, where she was refitted and supplied with two additional cannonades and a French crew *402 'consisting of seventy men. From that island she was conveyed to the Isle of France. On her arrival off that place she was anchored by the British frigate The Nereid, and, having-fired several shots in return at the frigate and fort, she passed on to her anchorage at another point. While lying in that port she was attacked by the British squadron, when, with the assistance of other French ships, she succeeded in repelling the attack and destroying the British squadron. She was then taken to another port, dismantled, and fitted out as a prison ship for English prisoners of war, in which condition she was found at the time of the capture of the island. The question was whether this ship was “sufficiently set forth for war” to come within the prize act, which directs restitution of British ships recaptured from the enemy, unless they shall have been “set forth as ships or vessels of war by the enemy.”
The court held in that case, by Sir William Scott, that she came within the phraseology of the statute “set forth as ships or vessels of war.”
The question presented and decided in that case is not the question submitted to the consideration of the court in this proceeding. The question is not whether the vessel belonged to the United States as a part and parcel of the war equipment, but whether, in the battle of Manila, she was so constituted, equipped, and conditioned as to come within the letter or spirit of the statute entitling vessels to participate in the bounty, upon the theory that they participated in the battle.
The claimant in this case and his crew were not in the military service of the United States. They had not been enlisted or hired to perform and discharge military duty. They were not identified with the naval force, in a military sense, which fought the battle and won the victory at Manila.
It would be an unjust discrimination against the men who were in the service, subject to all the restrictions ánd requirements of that service, and all the dangers incident to that battle, to allow the demand of the claimant, who did not undertake, by any obligation, to perform the duties and discharge the functions of a soldier.
The men who participated in that battle and who contributed to its success as a great American victory are entitled to share the glory and participate in the bounty of the engage *403 ment, without having that glory lessened or dimmed, or that bounty impaired by men who were simpty employed to perform the manual functions of a ship, which, in the hour of danger to the forces of the United States, was an impediment instead of a help in the prosecution of belligerent operations against the enemy.
For these reasons the Auditor will'be instructed not to allow the claim of the claimant in the distribution of the proceeds due to the men and officers of the United States Nav3r who fought and won the battle of Manila.